RECEIVED AND FILED
2011 FEB 15  AM 11: 02
CLERK'S OFFICE
U.S. DISTRICT COURT
SAN JUAN, P.R.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,
    Plaintiff,

v.

EPPS SHIPPING COMPANY,
    Defendant.

CRIM. NO. 11-058 (DRD)

## PLEA AGREEMENT,
### IN ACCORDANCE WITH RULE 11(c)(1)(A) & (B)

**TO THE HONORABLE COURT:**

The United States of America, by and through the undersigned attorneys, the defendant,

**EPPS SHIPPING COMPANY** ("Defendant"), and Defendant's attorney, Luis Cuervo, Esq., very

respectfully state to this Honorable Court that they have reached an agreement ("the Agreement")

pursuant to Rule 11(c)(1)(B), the terms and conditions of which are as follows:

1.     **COUNTS TO WHICH DEFENDANT PLEADS GUILTY:**

Defendant, **EPPS SHIPPING COMPANY**, agrees to plead guilty to **COUNTS 1** and **2** of

the Information. More specifically, **COUNTS 1** and **2** of the Information charge, in relevant part,

as follows:

### COUNT 1
**Act to Prevent Pollution from Ships
(Title 33, United States Code, Section 1908(a))**

On or about November 6, 2010, and within the navigable waters
of the United States in the District of Puerto Rico, Defendant,

**EPPS SHIPPING COMPANY,**

acting through its agents and employees, who were acting within
the scope of their agency and employment, and on behalf of
defendant, did knowingly fail to maintain an Oil Record Book for
the *M/V Carib Vision* in which all disposals of oil residue,



Plea Agreement
*United States v. EPPS Shipping Company*

overboard discharges, and disposals of bilge waste were required to be fully recorded. Specifically, Defendant maintained an Oil Record Book that failed to record that overboard discharges of oily sludge and bilge waste were made through the emergency bilge discharge system without the use of properly functioning oil water separating and monitoring equipment, which created the overall false and misleading impression that the vessel was being operated properly and was fully maintaining an accurate Oil Record Book.

All in violation of Title 33, <u>United States Code</u>, Section 1908(a) and Title 33, <u>Code of Federal Regulations</u>, Section 151.25.

## COUNT 2
### False Statement
#### (Title 18, <u>United States Code</u>, Sections 1001(a))

On or about November 6, 2010, and within the navigable waters of the United States in the District of Puerto Rico, Defendant,



## EPPS SHIPPING COMPANY,

acting through its agents and employees, who were acting within the scope of their agency and employment, and on behalf of Defendant, in a matter within the jurisdiction of the United States Coast Guard and the Department of Homeland Security, did knowingly and willfully make and use and cause to be used a materially false writing to wit: the Oil Record Book for the *M/V Carib Vision*, that was presented to U.S. Coast Guard inspectors during the course of a port state control inspection in the Port of San Juan, Puerto Rico, knowing the same to contain a materially false, fictitious, and fraudulent statement, entry and representation, in that the Oil Record Book for the *M/V Carib Vision* failed to state and omitted the fact that oily waste water had been discharged directly into the ocean, when in truth and in fact as Defendant then and there well knew, some volume of oil-contaminated wastes not recorded in the Oil Record Book had been discharged overboard without the use of properly functioning oil water separating and monitoring equipment.



Plea Agreement
*United States v. EPPS Shipping Company*

All in violation of Title 18, United States Code, Sections 1001(a)(2)
and (3).

## 2.    MAXIMUM PENALTIES

The maximum penalty for the offense charged in **COUNT 1** of the Information is a
maximum fine of either Five Hundred Thousand Dollars ($500,000.00), or twice the gross gain or
loss resulting from the unlawful conduct, pursuant to 18 U.S.C. § 3571(c) and (d); and a term of
probation of five (5) years, pursuant to 18 U.S.C. § 3561(c)(1).

The maximum penalty for the offense charged in **COUNT 2** of the Information, is a
maximum fine of either Five Hundred Thousand Dollars ($500,000.00), or twice the gross gain or
loss resulting from the unlawful conduct, pursuant to 18 U.S.C. § 3571(c) and (d); and a term of
probation of five (5) years, pursuant to 18 U.S.C. § 3561(c)(1).

## 3.    SPECIAL MONETARY ASSESSMENT

At the time of sentencing, Defendant will pay a special monetary assessment of eight
hundred dollars ($800.00) as required by Title 18, United States Code, Section 3013(a)(2)(B).

## 4.    RESTITUTION

Pursuant to 18 U.S.C. § 3663A(a), Defendant agrees to make full restitution. At this time
the parties are unaware of any identifiable victims or restitution due.

-3-



Plea Agreement
*United States v. EPPS Shipping Company*

### 5.   RULE 11(c)(1)(B) WARNINGS

Defendant is aware that the Defendant's sentence is within the sound discretion of the sentencing judge, but the same may be imposed following the <u>United States Sentencing Guidelines, Policy Statements, Application, and Background Notes</u> as advisory to the imposition of sentence. Defendant is aware that the Court has jurisdiction and authority to impose any sentence within the statutory maximum set for the offense to which Defendant pleads guilty. If the Court should impose a sentence up to the maximum established by statute, Defendant cannot, for that reason alone, withdraw a guilty plea, and will remain bound to fulfill all of the obligations under this Plea Agreement.

### 6.   ADVISORY NATURE OF THE SENTENCING GUIDELINES

Defendant is aware that pursuant to the United States Supreme Court decisions in <u>United States v. Booker</u> and <u>United States v. Fanfan</u>, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed.2d 621 (2005), the Sentencing Guidelines are no longer mandatory and must be considered effectively advisory.

### 7.   SPECIFIC SENTENCE RECOMMENDATION

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the United States and Defendant agree to jointly recommend that the sentence to be imposed by the Court shall include the following components. The parties understand that such a recommendation is not binding on the Court and that, if not accepted by this Court, neither the United States nor Defendant will be allowed to withdraw from the plea agreement.

A.   **Penalty:** Defendant agrees to pay a total criminal fine of Six Hundred Thousand Dollars ($600,000). The United States shall make a recommendation to the Court that the

-4-



Plea Agreement
*United States v. EPPS Shipping Company*

total criminal penalty be allocated as follows: Three Hundred Thousand dollars ($300,000) to Count

One of the Information and Three Hundred Thousand dollars ($300,000) to Count Two of the

Information.

       B.    **Community Service Payment:** In addition to the criminal fine, Defendant

agrees to pay One Hundred Thousand Dollars ($100,000) in a community service payment. The

parties will recommend to the Court at the time of sentencing which community service organization

will receive the payment.

       Defendant shall not characterize, publicize, or refer to the Community Service

Payment as a voluntary donation or contribution, nor shall Defendant seek any reduction in its tax

obligations as a result of having made the Community Service Payment.

       C.    **Mandatory Special Assessment:** Defendant shall pay a special assessment

for each count of conviction for a total aggregate special penalty amount of $800.00.

       D.    **Payments:** If the Court accepts the terms of this agreement, Defendant agrees

to pay the monetary penalty specified above according to the following schedule:$100,000 due on

date of sentencing, and four equal annual installments of $150,000 due on the yearly anniversary of

sentencing. Payments are to be made in the form of a check payable to "United States District Court

Clerk." The Community Service Payment is to be made from the initial payment upon sentencing.

Defendant shall also provide to the United States Coast Guard a bond sufficient to cover any

outstanding fine payments. Failure of Defendant to make a scheduled payment will result in

forfeiture of the bond and the United States will collect on the bond in full.





Plea Agreement
*United States v. EPPS Shipping Company*

      E.   **Probation:** The parties jointly recommend that Defendant be placed on organizational probation for a period of five (5) years from the date of sentencing pursuant to 18 U.S.C. § 3561(c)(1) and USSG §§ 8D1.1 and 8D1.2. The parties recommend that the terms of probation be as follows:

      (1)   No Further Violations. Defendant agrees that it shall commit no further violations of MARPOL 73/78, federal, state or local law, including those laws and regulations for which primary enforcement has been delegated to the state authorities, and shall conduct all its operations in accordance with environmental laws of the United States.

      (2)   Payments. Payment in full of the monetary amounts as set forth herein including all special assessments, fines and restitution, and community service.

      (3)   Environmental Compliance Plan. Defendant agrees to fund and implement environmental remedial measures that will be set forth in an Environmental Compliance Plan ("ECP") that will apply to all vessels owned, operated, managed and chartered by Defendant or those that it employs to manage or operate its vessels, the terms of which will be filed before sentencing, during its term of probation, consistent with sentencing policies set forth in USSG §8D1.4.

      F.   **Operation of Vessel(s):** Defendant agrees that within 90 days of entry of this Plea Agreement, that it will retain a new operator and technical manager to operate its ships and to require that the operator and technical manager comply with the special conditions of probation including the Environmental Compliance Program.



Plea Agreement
*United States v. EPPS Shipping Company*

**8.      NO FURTHER ADJUSTMENTS OR DEPARTURES**

The United States and Defendant agree that, subject to that mentioned above in Paragraph 8,

entitled "Specific Sentence Recommendation," no further adjustments or departures are warranted.

The parties agree not to seek a sentence other than that recommended herein.

**9.      SATISFACTION WITH COUNSEL**

Defendant represents to the Court that it is satisfied with legal counsel, Luis Cuervo, Esq., and

further indicates that Mr. Cuervo has rendered effective legal assistance.

**10.     RIGHTS SURRENDERED BY DEFENDANT THROUGH GUILTY PLEA**

Defendant understands that by entering into this Agreement, Defendant surrenders certain

rights as provided herein.  Defendant understands that the right of criminal defendants include the

following:

    a.    If Defendant had pleaded guilty to charges in an Indictment, Defendant would have the right to a speedy jury trial with the assistance of counsel.  The trial may be conducted by a judge sitting without a jury if the defendant, the United States and the judge agree.

    b.    If a jury trial is conducted, the jury would be composed of twelve lay persons selected at random.  Defendant and Defendant's attorney would assist in selecting the jurors by removing prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.  The jury would have to agree, unanimously, before it could return a verdict of either guilty or not guilty.  The jury would be instructed that Defendant is presumed innocent, that it could not convict Defendant unless, after hearing all the evidence, it was persuaded of Defendant's guilt beyond a reasonable doubt, and that it was to consider each charge separately.

    c.    If a trial is held by the judge without a jury, the judge would find the facts and, after hearing all the evidence and considering each count separately,

-7-



Plea Agreement
*United States v. EPPS Shipping Company*

      determine whether or not the evidence established Defendant's guilt beyond a reasonable doubt.

d.    At trial, the United States would be required to present its witnesses and other evidence against the defendant. Defendant would be able to confront those witnesses Defendant's attorney would be able to cross-examine them. In turn, Defendant could present witnesses and other evidence in Defendant's own behalf. If the witnesses for Defendant would not appear voluntarily, Defendant could require their attendance through the subpoena power of the Court.

e.    At trial, Defendant could rely on the privilege against self-incrimination to decline to testify, and no inference of guilt could be drawn from Defendant's refusal to testify. If the Defendant desired to do so, Defendant could testify on it's own behalf.

**11.    CORPORATE DEFENDANT**

      The undersigned corporate officer or representative of Defendant hereby certifies that he is authorized by the defendant corporation to act on its behalf, to plead guilty to the charges alleged in the Information, and to enter into this plea agreement, and that a corporate resolution so empowering said officer or representative has been duly made and approved by said corporation. Said Defendant corporation has agreed to implement and fund the Environmental Compliance Plan ("ECP") set forth herein. Defendant corporation further agrees that such a program may be made a condition of probation, should the Court determine that a sentence of probation is appropriate.

**12.    STATEMENT OF FACTS**

      Defendant is pleading guilty because defendant is in fact guilty. Defendant does hereby admit that the facts set forth below are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt:

<u>FACTS</u>

Plea Agreement
*United States v. EPPS Shipping Company*

      A.    The *M/V Carib Vision* was an approximately 5,070 ton ocean-going ship owned and controlled by **EPPS SHIPPING COMPANY** (hereinafter **"EPPS"**). The *M/V Carib Vision* was registered in St. Kitts and Nevis, and was engaged in international trade and made a port call in the District of Puerto Rico on or about November 6, 2010,

      B.    Defendant was a private limited company incorporated under the laws of Liberia and was engaged in the business of transporting bulk molasses in international commerce using the *M/V Carib Vision*. The operating address of the company was Street 203 DA 30 Valle Arriba Heights, Carolina, Puerto Rico, 00983.

      C.    Defendant, acting through its employees and agents, who acted within the scope of their employment and/or for the benefit of Defendant, including the senior engineers and other crew members on board the *M/V Carib Vision,* had overall responsibility for the operation of the Engine Department on board the *M/V Carib Vision*, including the management, treatment, storage, and disposal of oil residue, oily mixtures and machinery space operations.

      D.    The senior engineers on board the *M/V Carib Vision* were also responsible for recording the movement, discharge, and disposal of oil residue, oily mixtures, and machinery space bilge waste, including any non-accidental overboard discharges of oily waste, in the vessel's machinery space Oil Record Book ("ORB").

      E.    Defendant provided for, and paid, the salaries of the entire crew of the *M/V Carib Vision,* including the salaries of the senior engineers responsible for maintaining the ORB. Defendant also, from time to time, provided supplies and materials for the operation and maintenance of the *M/V Carib Vision* including for the engineering machinery and pollution prevention equipment.



Plea Agreement
*United States v. EPPS Shipping Company*

F.      Defendant was responsible for paying for shore-side disposal of oily waste, oil mixtures and oil residue from the *M/V Carib Vision*.

G.      The United States is a party to an international treaty, the International Convention for the Prevention of Pollution from Ships ("MARPOL"). MARPOL was implemented in the United States by the Act to Prevent Pollution from Ships (APPS), 33 U.S.C. § 1908, et. seq. APPS regulations require that vessels of more than 400 gross tons, such as the *M/V Carib Vision*, maintain an ORB. The ORB must fully reflect transfers of oil, tank to tank, the disposal of sludge and waste oil, discharges of water from slop tanks, and overboard discharges of bilge water that has accumulated in machinery spaces, and thus may be contaminated with oil. MARPOL, Annex I Regulation 20 and 33 CFR § 151.25(h). The United States Coast Guard ("Coast Guard") routinely inspects ORBs on board vessels to determine whether the vessel has been discharging any oil or oily mixtures in violation of MARPOL and APPS. 33 CFR § 151.23. The ORB must be maintained on board the vessel for three (3) years and be readily available for inspection at all times. MARPOL, Annex I, Regulation 20.

H.      On or about November 6, 2010, the Coast Guard conducted a Port State Control inspection of the *M/V Carib Vision* in the port of San Juan, Puerto Rico, a port or terminal of the United States in the District of Puerto Rico. During the inspection, the Coast Guard discovered that the vessel's Oil Water Separator and discharge monitoring equipment was inoperable and that the vessel's crew could not get the equipment to operate properly. The Coast Guard detained the vessel for these deficiencies.

I.      Prior to November 6, 2010, while the *M/V Carib Vision* was owned and controlled by **EPPS**, engineering officers and other crew members aboard the *M/V Carib Vision*,

-10-



Plea Agreement
*United States v. EPPS Shipping Company*

acting within the scope of their employment and agency, and on behalf of and for the intended benefit

of Defendant, discharged some quantity of oily waste from the *M/V Carib Vision* that was not

properly processed, filtered, and monitored by the Oil Water Separator and monitored by a fully

functioning Oil Content Meter.

J.   By pleading guilty, Defendant admits that prior to November 6, 2010, its agents

and employees onboard the *M/V Carib Vision*, used the ship's installed emergency bilge discharge

system to pump oily waste directly over the side of the ship into the ocean.  The emergency bilge

discharge system may only be used to discharge bilge waste directly into the sea in order to save the

vessel and/or the crew.  Even if the emergency bilge discharge system is used lawfully, the use must

be recorded in the vessel's Oil Record Book.  During the Coast Guard's inspection on November 6,

2010, an excessive amount of oily waste was discovered in the emergency bilge discharge system

leading to the overboard discharge valve.  Tests of the oily waste from the emergency bilge discharge

system and from an oil waste storage tank in the engine room confirmed they were from a common

source of petroleum oil.  This test result demonstrates that the system was not used as designed to

empty the bilge in an emergency situation, rather it was used to empty a waste oil tank into the sea.

K.   Prior to November 6, 2010, while the *M/V Carib Vision* was owned and

controlled by EPPS, engineering officers and other crew members aboard the *M/V Carib Vision*,

acting within the scope of their employment and agency, and on behalf of and for the intended benefit

of the Defendant, knowingly failed to make required entries recording these discharges in the vessel's

ORB, including the fact that oily bilge wastes were discharged directly overboard without using

-11-



properly functioning oil filtering equipment including an Oil Water Separator and  monitored by a fully functioning Oil Content Meter.

   L.  On or about November 6, 2010, during the course of the Port State Control boarding, senior engineers on board the *M/V Carib Vision*, who acted as agents of, and for the intended benefit of Defendant, deliberately presented and caused to be presented a false ORB to representatives of the Coast Guard, when they then there well knew the ORB failed to disclose illegal overboard discharges of oily waste.



   M.  Defendant EPPS cooperated in this investigation by promptly admitting that its employees and agents had made and used a falsified Oil Record Book and had knowingly failed to maintain an accurate Oil Record Book.  But for the defendant's timely cooperation, and its alleged inability to pay which was verified by access to defendants books and records, the United States would have sought a higher criminal fine.  Defendant has expressly sought a rapid resolution to this case by freely and voluntarily entering into this Plea Agreement.

<div align="center">-12-</div>



Plea Agreement
*United States v. EPPS Shipping Company*

### 13.    LIMITATIONS OF PLEA AGREEMENT

This Plea Agreement binds only the United States Attorney's Office for the District of Puerto Rico, the Environmental Crimes Section of the U.S. Department of Justice, and Defendant. It does not bind any other federal district, state or local authorities. Furthermore, Defendant is fully aware that the Court is not bound by this Plea Agreement, nor is it bound by the advisory sentencing guidelines calculations, any stipulations, or any sentence recommendations. As part of this Agreement and solely because of the promises made by Defendant in this Agreement, the government agrees not to criminally prosecute Defendant in the District of Puerto Rico for any environmental offenses or related offenses involving the *M/V Carib Vision* including but not limited to the discharge of oil, the failure to report the discharge of oil, false statements or related acts of obstruction that are related to the offense set forth in the Information in this matter and /or arise out of the conduct giving rise to the investigation of *M/V Carib Vision* which occurred before the date of this Agreement and are known to the Government at the time of the signing of this Agreement. Defendant understands and agrees that neither this paragraph nor this Agreement limits the prosecuting authority of any other sections or divisions of the U.S. Department of Justice, including the U.S. Attorney of any other judicial district, or any other federal, state or local regulatory or prosecuting authorities. Furthermore, this Agreement does not provide or promise any waiver of any civil or administrative actions, sanctions, or penalties that may apply, including but not limited to: fines, penalties, claims for damages to natural resources, suspension, debarment, listing to restrict rights and opportunities of Defendant to contract with or receive assistance, loans, and benefits from United States agencies, licensing, injunctive relief, or remedial action to comply with any applicable regulatory requirement.



-13-



Plea Agreement
*United States v. EPPS Shipping Company*

This Agreement applies only to crimes committed by Defendant and has no effect on any proceedings against any Defendant not expressly mentioned herein, including the actual or potential criminal liability of any individuals.

### 14.   ENTIRETY OF PLEA AGREEMENT

This written Agreement constitutes the complete Plea Agreement between the United States, Defendant, and Defendant's counsel. The United States has made no promises or representations except those set forth in writing in this Plea Agreement. The United States further denies the existence of any other terms or conditions not stated herein.



### 15.   AMENDMENTS TO PLEA AGREEMENT

No other promises, terms or conditions will be entered into unless they are in writing and signed by all the parties.

### 16.   WAIVER OF APPEAL

The defendant hereby agrees that if this Honorable Court accepts this Plea Agreement and sentences Defendant according to its terms, conditions and recommendations, Defendant then waives and permanently surrenders his right to appeal the judgment and sentence in this case.

Plea Agreement
*United States v. EPPS Shipping Company*

### 17. VOLUNTARINESS OF GUILTY PLEA

Defendant hereby acknowledges that no threats have been made against Defendant and that Defendant is pleading guilty freely and voluntarily because defendant is truly guilty.

**ROSA EMILIA RODRIGUEZ-VELEZ**
United States Attorney

By:

_____
Corporate Officer or Authorized
Representative of
**EPPS SHIPPING COMPANY**
Defendant

_____
**José A. Ruiz-Santiago**
Assistant United States Attorney
Chief, Criminal Division
Date: 12/23/10

_____
Luis Cuervo, Esquire
Attorney for Defendant

_____
**Ernesto López-Soltero**
Assistant United States Attorney
Deputy Chief, White Collar Crime Unit
Date: 12/23/10

_____
**Marshal D. Morgan**
Assistant United States Attorney
Date: 2/15/11

**IGNACIA S. MORENO**
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

By: _____ 12/21/10

**Kenneth E. Nelson**
Trial Attorney
Environmental Crimes Section
Environment and Natural Resources Division
U.S. Department of Justice

-15-

Plea Agreement
*United States v. EPPS Shipping Company*

I hereby certify that I have consulted with my attorney and I fully understand all my rights with respect to the Information pending against me. I also fully understand my rights with respect to the provisions of the Sentencing Guidelines, as well as the Policy Statements, Application, and Background Notes which may apply in my case. I have also read and carefully reviewed each and every part of this Plea Agreement with my attorney and I freely and voluntarily agree to it.

Date: _December 21, 2010_

**EPPS SHIPPING COMPANY**
Corporate Officer or Authorized Representative
Defendant

I hereby certify that I am the attorney for the defendant and I have carefully reviewed every part of this Plea Agreement with my client. I also certify that I have fully explained the rights with respect to the Information, including the provisions of the Sentencing Guidelines, and the Policy Statements, Application, and Background Notes that may apply in this case to my client. I have also fully explained those provisions of the guidelines which may apply in this case. I have also explained to my client the advisory nature of the Sentencing Guidelines. To my knowledge, the defendant is entering into this Agreement voluntarily, intelligently and with full knowledge of all the consequences of a plea of guilty.

Date: __12/21/2010__

**Luis Cuervo, Esquire.**
Counsel for Defendant

-16-



**ATTACHMENT A**
Environmental Compliance Plan

PURSUANT TO PLEA AGREEMENT

<u>United States v. EPPS Shipping Company</u>

The following ENVIRONMENTAL COMPLIANCE PROGRAM (ECP) has been prepared pursuant to the Plea Agreement between EPPS Shipping Company (hereinafter "EPPS") and the United States (hereinafter "Government") filed in the United States District Court for the District of Puerto Rico. Compliance with all of the standards and requirements of the ECP is an essential term of the Plea Agreement.

EPPS is the sole owner of M.V. CARIB VISION, IMO Number 7636561. EPPS does not own, operate, or manage any other vessel at the time of entry of this Plea Agreement.

This ECP includes provisions to ensure that all vessels directly or indirectly operated, managed, manned and/or controlled by EPPS which call or may call at ports or places in the United States, specifically to include Puerto Rico, comply with all maritime environmental requirements established under applicable international, flag state and port state law, including, but not limited to the International Convention for the Safety of Life at Sea (SOLAS), the International Safety Management (ISM) Code, the International Convention for Prevention of Pollution from Ships (MARPOL) and all applicable Federal and state statutes and regulations including, but not limited to, the Ports and Waterways Safety Act (PWSA), the Act to Prevent Pollution from Ships (APPS), the Clean Water Act (CWA), and the Oil Pollution Act (OPA), and with the requirements of this agreement itself.

**A. APPLICABILITY/PURPOSE**



(1) This ECP shall cover and apply to all of EPPS operations, including all subsidiaries and agents (owned wholly or partially by EPPS), involved in the operation of seagoing vessels calling in United States ports which are owned, operated, managed and/or manned by EPPS on the date of sentencing or at any time during the period of probation. It shall also include all persons working for EPPS, its subsidiaries, affiliated business entities, agents, and any other individuals or organizations who are involved in the operation, maintenance and repair of aforesaid seagoing vessels, operated, managed and/or manned by EPPS, as direct EPPS employees or independent contractors on the date of sentencing or at any time during the period of probation.

(2) The ECP is not intended to replace the ISM Code, or any other applicable international legal requirement or United States statute and regulation. The purpose of this ECP is to augment the requirements of existing law by increasing and improving inspections, reviews, and audits of EPPS operated and/or managed vessels which call or may call at ports or places in the United States, and operations involving said vessels; replace existing vessel management and improve EPPS controls to detect and prevent environmental violations; and require periodic reports to the United States Probation Office for the District of Puerto Rico, the United States Attorney's Office for the District of Puerto Rico, the Environmental Crimes Section of the United States Department of Justice, and the United States Coast Guard (collectively hereinafter "the United States") to ensure that EPPS is following the requirements of this ECP and that all of its vessels comply with all maritime environmental requirements established under applicable international, flag state, and port state law and all applicable Federal and state statutes and regulations, and that an effective environmental management system is in place to prevent recurrence of violations.

(3) In the event that EPPS contracts with a third party to operate or provide manning for a vessel, EPPS shall ensure that such third parties understand that EPPS has in place this ECP and that certain requirements will require cooperation and assistance from the third party operator or manning agent. Such requirements shall be explicitly stated in any third party contract for the operation or manning of any vessel covered under this ECP.

**B. CORPORATE COMPLIANCE MANAGER**

(1) Within sixty (60) days of entry of the imposition of sentence, EPPS shall designate a Corporate Compliance Manager

1

(hereinafter "CCM"). EPPS shall provide the name of the CCM to the United States. The CCM should be the same individual as EPPS "designated person" under the ISM Code unless reasons are provided to the United States justifying why the "designated person" should not also be the CCM. The CCM shall be responsible for coordinating with the Court Appointed Monitor ("CAM") as more fully described below, developing and implementing all of the procedures and systems required herein, establishing and implementing training programs for the officers and crew of EPPS vessels, ensuring that reviews, audits and surveys are carried out as required and ensuring that all documents are properly maintained and that reports are made on a timely basis to the CAM and the United States. All reports required under this ECP shall be reviewed by the CCM and signed under the penalty of perjury. For all training and other activities that EPPS has subcontracted out to an operating company, such as crew training and ISM auditing, the CCM shall ensure that the requirements of this ECP are being carried out by the operating and/or manning company.

(2)  EPPS shall establish a procedure and reporting system that requires and enables all officers, crewmembers and employees to notify the CCM of all violations of any applicable environmental requirements or other requirements of this ECP and to cooperate fully with the CAM and the United States in carrying out their reviewing, auditing and oversight functions required by applicable law and this ECP. EPPS agrees to establish a procedure that makes failure to notify the CCM of any violations of any applicable environmental requirements and failure to cooperate fully with the Classification Societies, the CAM and the United States in carrying out their auditing and oversight functions required by applicable law and this ECP, grounds for dismissal. EPPS agrees not to retaliate against any officer, crewmember, employee, or shoreside personnel involved in the manning and/or operation of EPPS seagoing vessel making such report.

(3)  The CCM shall be authorized to access all records and personnel regarding all vessels subject to the ECP for the purpose of ensuring compliance with the ECP, and to implement all ECP requirements on the vessels. The CCM shall be authorized to implement all requirements of the ECP on all vessels subject to the ECP. The CCM shall ensure that audits and surveys are carried out as required, that all documents are properly maintained and that reports are made on a timely basis to the U.S. Probation Office, CAM, the designated representative of the Coast Guard, and EPPS. EPPS will suggest the name of its proposed CCM to the government within 30 days of entry of the Plea Agreement, for the government's approval.



**CCM Responsibilities:**

(a)  Ensure environmental compliance of EPPS' vessels.

(b)  Require adequate environmental compliance expertise and training from its newly designated vessel management company.

(c)  Auditing and Compliance Assessment

-Ensure that the CAM conducts the review and audits required by the ECP and that the required reports     are prepared.

(d)  Reporting of Non -Compliance by Employees and Crew Members

-Establish a means by which employees and crewmembers may report (anonymously if so desired) issues of non-compliance with this ECP and any other procedure, policy, or regulation associated with environmental protection.

## C. MASTER AND CHIEF ENGINEER

(1) The Master of each EPPS vessel subject to this ECP, with the assistance of the CCM, shall ensure that prompt reports are made to the United States Coast Guard of any non-compliant condition of any EPPS vessel that calls upon any port or place in the United States or sails into any waters under the jurisdiction of the United States.

(2) The Chief Engineer on board all vessels subject to this ECP shall perform the following duties regarding this ECP:

-To daily measure, monitor and manage shipboard generated wastes;

-Report to the CCM and cooperate with EPPS and EPPS's management company to resolve environmental concerns, such as inoperative or ineffective pollution prevention equipment and document all efforts to do so in a log that is available for review and audit at all times.

## D. COURT APPOINTED MONITOR AND VESSEL AUDITS

(1) Within thirty (30) days of the entry of the imposition of sentence EPPS will submit a list of three qualified candidates for the CAM from which the United States will appoint one of the candidates. In the event that the United States does not find one of the candidates satisfactory, or if it does not find the work of the CAM satisfactory, at any time they may request EPPS to supply additional candidates. Further, if an agreement cannot be reached regarding the selection, the decision shall be left up to the Court.

(2) Qualified candidates for the CAM position must have expertise and competence in the regulatory programs under U.S. and international environmental laws, and have expertise and competence in waste stream evaluation, monitoring and control technologies, with a primary emphasis on engine room and machinery space operations, used by EPPS to achieve and maintain compliance in respect to EPPS seagoing vessels. The CAM shall have sufficient expertise and competence to assess whether EPPS has an adequate Environmental Management System in place to assess regulatory and ECP compliance, to correct non-compliance, and to prevent future non-compliance. EPPS and the United States acknowledge that the functions of the CAM may, by mutual agreement, be fulfilled by one or more individuals.

(3) The CAM must not directly own any stock in EPPS, any of its subsidiaries, affiliated business entities (owned wholly or partially by EPPS) or any agents of EPPS, and must have no other direct financial stake in the outcome of duties conducted pursuant to this Plea Agreement. The CAM must be capable of exercising the same independent judgment and discipline that a certified public accounting firm would be expected to exercise in auditing a publicly held corporation. If EPPS has any other contractual relationship with the CAM, both EPPS and the CAM shall disclose to the United States such past or existing contractual relationships.

(4) If the United States determines that the proposed CAM does not reasonably meet the qualifications set forth in the previous paragraphs, or that past or existing relationships with the CAM would affect the CAM's ability to exercise the independent judgment and discipline required to conduct the ECP review and evaluation, such CAM shall be disapproved and another CAM shall be proposed by EPPS within thirty (30) days of EPPS receipt of the United States' disapproval.



(5) The CAM shall conduct a yearly audit of EPPS vessels while the vessels are underway and operating on voyages of short duration. EPPS and the CAM shall coordinate the underway audits to accommodate, as much as practicable, the vessels' operations and schedule. The audits shall be performed to ascertain and evaluate various aspects of EPPS vessels: their systems, equipment and components; current practices whether documented or not; and the knowledge, skills, and abilities of ship as it relates to the requirements of this ECP, and other maritime environmental protection requirements.

(6) The audits purpose is to review all areas of the operations that may impact various elements of pollution prevention and environmental protection. It will exceed a typical SMS audit in scope and will be used to determine practices, procedures and equipment conditions not typically documented during a routine inspection by the classification society, port or flag state inspection processes. The results of the audits will be used to shape and revise the Environmental Management System established by this ECP. United States representatives may participate in the audits as observers at Government expense. EPPS shall make timely notification to the United States regarding audit scheduling in order to make arrangements for observers to be present.

(7) The audits shall meet the following specific requirements:

(a) It shall assess all waste streams developed from any system, equipment and components found in each machinery space on board EPPS vessels. This will include observation and documentation describing the leakages apparent on each system that can contribute to bilge loading. The audit will determine the status and quantify leakages stemming from:

3

    (i)    all pump and valve seals and glands during operation,
    (ii)   all piping systems, flanges, gaskets, fittings and joints,
    (iii)  all equipment casings such as main and auxiliary engines, and reduction gears,
    (iv)  operation of engines, boilers, incinerators, and evaporators, and
    (v)   all other mechanical components found aboard EPPS vessels.

(b) It shall assess the adequacy and performance of the Oily Water Separator (OWS) and Incinerator (if so equipped), Sewage System, and any other pollution prevention equipment to handle the quantities and types of wastes developed during normal operations. To assess the performance of the OWS, the auditor shall conduct at least a one hour test using the normal tank or bilge well supply as would be used in normal operations.   The supply tank or bilge well must not be diluted.   It will include an evaluation of the capacities for all tanks or containers associated with the management of sludges, bilges and oily wastes or other Wastes. It will include an evaluation of documentation tracking, maintenance and repair, and modifications of all pollution prevention equipment, and notification of equipment failure to the ECM.

(c) It shall assess each vessel's crew and their current workloads relating to all work performed on the vessel's systems, equipment and components, in an effort to ascertain that even the least significant leakages contributing to waste streams are remedied in a prompt and effective manner.

(d) It shall assess the adequacy of the policy, procedures, current practices and equipment, including storage capabilities used to manage shipboard solid wastes generated in all areas of the vessel and the effectiveness of garbage management plans.

(e) It shall assess the ability of each vessel's crewmembers to create, devise or implement an unauthorized process to dispose of a shipboard waste including regular garbage, machinery space and cargo-generated wastes.

(f) It shall assess the adequacy of each vessel's responsible crewmembers to maintain the following records and shall include a complete comparative analysis (against each other where possible) of the following records:



    (i)      Oil Record Book,
    (ii)     Engine room Alarms,
    (iii)    Tank sounding sheets,
    (iv)    Personal work records and lists,
    (v)     Maintenance records,
    (vi)    Vendor service records,
    (vii)   Bilge waste and sludge receipts,
    (viii)  Deck Log,
    (ix)    Garbage Record Book,
    (x)     Wastewater Discharge Log,
    (xi)    Oil to Sea Equipment Interface Logs,
    (xii)   Hazardous waste manifests,
    (xiii)  Solid waste discharge receipts,
    (xiv)  Content Monitor (OWS) calibration logs,
    (xv)   Training records,
    (xvi)  Vetting documents,
    (xvii)  Inspection Documents, and
    (xviii) SMS or SQE Audit documents

(g) It shall assess the adequacy of the policy, procedures, and current practices used to store and dispose of:

    (i)      Solvents,
    (ii)     Degreasers,

(iii)    Cleaning wastes,
(iv)    Batteries,
(v)    Paints,
(vi)    Oily rags,
(vii)    Fluorescent and incandescent bulbs,
(viii)    Expired boiler and engine chemicals,
(ix)    Used boiler and engine chemicals,
(x)    Galley greases,
(xi)    Pyrotechnics,
(xii)    Medical supplies,
(xiii)    Contaminates fuels,
(xiv)    Used Oil and greases,
(xv)    Incinerator ash.
(xvi)    Transformer oils,
(xvii)    Contaminated refrigerants, and
(xviii)    Hazardous materials.

(h) It shall assess and evaluate documentation containing the certifications that each vessel's officers understand the requirements of this ECP and shall require signed statements by all vessel officers attesting that they understand false entries in the Oil Record Book for machinery space operations is a violation of law.

(i) It shall assess the policy, procedures, and current practices associated with the Master and Chief Engineer's capability to communicate with the CCM and designated persons, and shall review such communications.

(j) It shall assess the frequency and adequacy of, through interviews of crewmembers, shipboard pollution prevention and environmental protection meetings and training.

(k) It shall assess the policy, procedures, and current practices used on vessels to track crewmember environmental training, as well as the availability of and access to training resources.



(l) It shall assess the adequacy of existing methods for employees to report environmental concerns and evaluate the capability of a reporting individual to remain anonymous, and review processes of handling environmental complaints from crewmembers and any other EPPS personnel.

(m) It shall assess the policy, procedures, and current practices used to manage the existing seal tracking and valve locking program, including the storage of seals and preventing the use of duplicate seals.

(n) It shall assess the policy, procedures, current practices, and equipment used to maintain refrigeration units, including availability and status of refrigerant recovery units, procedures for recovering refrigerants, and maintenance of a leak log.

(o) It shall assess the policy, procedures, current practices, and equipment used to handle emergency releases of hazardous fluids or pollutants on deck or within machinery spaces of vessels, including a review of the Shipboard Oil Pollution Emergency Plan and evaluation of personnel performing such duties.

(p) It shall assess the policy, procedures, and current practices associated with ballast water management and invasive species requirements.

(q) It shall include a survey of all fleet engineers at all levels for information on how to make the OWS, OCM, associated systems and waste management processes tamperproof and for methods on reducing or handling waste accumulations within machinery spaces. Participation shall be mandatory for all engineering personnel. The survey

shall request the opinions of the vessels' engineers into their ability to adequately maintain the vessel systems, equipment and components. The survey will emphasize non-retaliation for open and honest opinions and reports of current noncompliant circumstances. The responses will be maintained in original format and made available to the CAM. The original survey responses shall be included in the Report of Findings.

(8)  At the conclusion of each audit, the first of which must be conduct within one hundred and twenty (120) days following imposition of sentence, the CAM shall prepare a Report of Findings. If the CAM believes that additional time is needed to analyze available information, or to gather additional information, or to complete the Report of Findings, EPPS may request that the Government grant the CAM such additional time, as required, which request shall not be unreasonably denied. If necessary, the Government may grant additional time in thirty (30) day increments for completion of the Report of Findings. The Report of Findings shall be provided to EPPS and the United States. Based on the Report of Findings, EPPS shall develop and/or improve its Environmental Management System and Manual as described below. The CAM shall conduct an audit using the above criteria during each year of probation in order to ascertain if EPPS has continued to implement the EMS system and whether the vessel is in compliance with environmental requirements.

(9)  Within sixty (60) days from completion of each audit of a vessel, EPPS shall develop and submit to the United States, for review and comment, an Action Plan for expeditiously bringing EPPS into full conformance with all applicable laws and regulations and the EMS/ECP Manual. The Action Plan shall include the result of any root cause analysis, specific deliverables, responsibility assignments, and an implementation schedule. EPPS may request that the United States permit a brief extension of the time limit stated above on a case by case basis. Such permission shall not be unreasonably withheld.

(10) The CAM shall submit an annual report to the U.S. Probation Office, EPPS, designated representative of the Coast Guard, and the Environmental Crimes Section, United States Department of Justice regarding each of the audits conducted by the CAM Plea Agreement and the ECP. The CAM reports shall provide a summary of the findings regarding the adequacy of any audits required by this ECP and adequacy of recommendations for change, as found necessary. The annual report shall also include and address any other information that the CAM is aware of which pertains to EPPS capabilities to meet the objectives of this ECP or any other marine environmental protection requirements.

(11) If the CAM receives information regarding a direct violation of any existing marine environmental protection requirement or requirement of this ECP, the CAM must immediately report the occurrence to the U.S. Probation Office and to the United States. The CAM shall be provided full access to all records, audit personnel, vessels and shore side facilities as is necessary to perform its duties.



## E. ENVIRONMENTAL MANAGEMENT SYSTEM

(1) The CCM shall be responsible for establishing an Environmental Management System (EMS). The EMS shall include the following core requirements:

(2) Environmental Policy:

The EMS should be based upon a documented and clearly communicated policy. This policy should set out the EPPS commitment towards a cleaner marine environment. It should include:

<div style="margin-left: 2em;">

(i)      provision for compliance with environmental requirements;

(ii)    commitment to continuous improvement in environmental performance, including those areas required by this ECP;

(iii)   commitment to pollution prevention that emphasizes source reduction, to include funding and human resources necessary to effectively maintain and repair the systems, equipment and components found in machinery spaces of vessels;

(iv)   commitment to continuous reduction of environmental risks; and

(v)    commitment to sharing information with external stakeholders on environmental performance.

</div>

(3) Communication of Environmental Requirements:

The EMS must provide a means to identify, explain, and communicate all environmental requirements, and any additional best practices or industry norms which EPPS may choose to adopt, to EPPS employees. The EMS must also specify procedures for incorporating changes in operations or environmental requirements into the communication plan.

(4) Objectives and Targets:

(a) The EMS shall establish specific objectives and targets for:

(i)     achieving and maintaining compliance with all marine environmental protection requirements and the requirements of this ECP;

(ii)    environmental performance demonstrating continuous improvement in regulated and non-regulated areas;

(iii)   pollution prevention that emphasizes source reduction with respect to machinery space waste streams and effective management of cargo related wastes; and

(iv)    sharing information with external stakeholders on environmental performance against all EMS objectives and targets.

(b) The EMS shall establish appropriate time frames to meet these objectives and targets. These must be documented and updated as environmental requirements change or as modifications occur in activities and structures within organizations in a manner that affects environmental performance or as a result of recommendations made by the CAM or other Auditor.

(5) Structure, Responsibility and Resources:



EPPS will ensure, to the best of its ability that its vessel's are in compliance with these objectives and targets. The EMS will describe in detail the procedures and steps for achieving those objectives and targets. The EMS will define the compliance roles and responsibilities of all vessel and shoreside personnel involved with the operation maintenance and repair of EPPS' vessels, and will indicate how they and other corporate personnel will be held accountable for achieving and maintaining compliance with this EMS, and other requirements of that EMS, and other marine environmental protection requirements. The EMS will also establish procedures for receiving and addressing concerns raised by EPPS employees and others regarding environmental performance and compliance.

(6) Operational Control:

The EMS will identify and provide for the planning and management of all of EPPS operations and activities with a view to achieving the ECP objectives and targets. For example, vessel deck department and engine room machinery space maintenance and repair will be an important aspect in achieving and maintaining compliance and enhancing environmental performance.

(7) Corrective and Preventive Action and Emergency Procedures:

(a) EPPS, through its EMS, will establish and maintain documented procedures for preventing, detecting, investigating, promptly initiating corrective action, and reporting (both internally and externally) any occurrence that may affect the organizations ability to achieve the ECP objectives and targets.

(b) Such measures must address incidents that may have an effect on compliance with environmental requirements as well as on environmental performance in regulated and non-regulated areas, including requirements of this ECP, or other marine environmental protection requirements. Examples of such situations include incinerator or oily water separator malfunctions, overflows of fuel or slop tanks, overflow of tanks within machinery spaces, fuel oil, lube oil, saltwater line failures, operator errors and other accidental releases.

(c) The EMS must also establish documented procedures for mitigating any adverse impacts on the environment that may be associated with accidents or emergency situations. If the environmental violation or incident resulted from a

7

weakness in the system, the EMS should be updated and refined to minimize the likelihood of such problems recurring in the future. The EMS should also, to the extent possible, provide for the testing and evaluation of emergency procedures.

(8)   Training, Awareness and Competence:

The EMS must establish procedures to ensure that all EPPS personnel whose job responsibilities affect the ability to achieve the ECP objectives and targets, have been trained and are capable of carrying out these responsibilities. In particular, the training should highlight means to enhance the ability of such personnel to ensure compliance with environmental requirements and voluntary undertakings, the requirements of the ECP, and other marine environmental protection requirements.

(9)   Organizational Decision-making and Planning:

The EMS must describe how these elements will be integrated into the EPPS overall decision-making and planning, in particular, decisions on capital improvements and repair planning for pollution prevention equipment.

(10)  Document Control:

The EMS must establish procedures to ensure maintenance of appropriate documentation relating to its objectives and targets and should also ensure that those records will be adequate for subsequent evaluation and improvement of the operation of the EMS. Additionally, all records will be maintained and made available to the CAM, auditors and port and flag state personnel.

(11)  Continuous Evaluation and Improvement:



(a)   The EMS must include methods to perform periodic, documented and objective internal auditing of the organization's performance in achieving these objectives and targets, and on how well the ECP assists the organization in achieving those objectives and targets. This requirement is independent from the auditing requirements detailed elsewhere in this plan. The goal of these internal audits and reviews will be to allow management to continuously monitor and assess vessel systems, equipment and components, and the ability and proficiency at which vessel crew members and personnel ashore comply to the policies and procedures established by this ECP.

(b)   The EMS will identify an ongoing process for assessing when a vessel is to be taken out of service for an environmental discharge related repair, such as when a discharge is caused by leaking stern tubes, thrusters or other equipment.

(c)   The EMS will promote non-retaliatory practices and ensure that employees are not punished or otherwise suffer negative consequences for reporting violations of environmental laws, regulations, or policies.

(d)   The EMS will describe potential consequences for departure from specified operating policies and procedures, including possible termination of employment, as well as criminal/civil/administrative penalties as a result of noncompliance.

(e)   The EMS will make employee compliance with environmental policies of the ECP, and other marine environmental protection requirements a positive factor, and failure to comply a negative factor, in all evaluations undertaken for the performance of all its employees.

(f)   The EMS will include policies against any incentive or bonus programs based on minimizing operational costs associated with the operation, maintenance and repair of machinery space systems, equipment and components to ensure that employees do not avoid such costs and thereby sacrifice environmental compliance.

(g)   The EMS will describe a confidential non-compliance reporting system that is adopted to ensure that employees may quickly and confidentially report discharges, spills, environmental incidents and other environmental performance data.

8

(h)  The EMS will identify all operations and activities where documented standard operating practices (SOPs) are needed to prevent potential violations or unplanned waste stream releases, with a primary emphasis on vessel engine room operations, systems, equipment and components and cargo residue management.

## F. ENVIRONMENTAL MANAGEMENT SYSTEM MANUAL

(1)  Within nine (9) months of receiving the Report of Findings on the first audit from the CAM, EPPS shall prepare an EMS Manual, which shall describe and document the EMS and contain any additional EMS implementation schedules as needed to ensure complete compliance in all operations and procedures. If EPPS believes that additional time is needed to analyze available information or to gather additional information to prepare the EMS Manual, EPPS may request that the Government grant it such additional time as needed to prepare and submit the EMS Manual, which request shall not be unreasonably denied. If necessary, the United States may grant additional time in thirty (30) day increments for completion of the EMS Manual.

(2) EPPS shall submit a proposed final EMS Manual to the CCM, the CAM and the United States immediately upon its completion. The CAM and the United States shall provide comments on the proposed EMS Manual within ninety (90) days of receipt unless additional time for review is requested in writing. EPPS shall submit a supplement to the EMS or a written response, as appropriate, within sixty (60) days of receipt of the comments. The EMS is subject to final approval from the United States, which approval shall not be unreasonably withheld.



(3)  All elements of the EMS Manual shall be fully implemented no later than nine (9) months following final approval by the United States. Upon receipt of final approval, EPPS shall immediately commence implementation of the EMS in accordance with the schedule contained in the EMS Manual. EPPS shall submit reports to the designated representative of the Coast Guard, and the Environmental Crimes Section, United States Department of Justice beginning no later than one hundred twenty (120) days following the publication of the Report of Findings by the CAM, regarding the status of the development and implementation of the EMS and the results of the Review and evaluation of EPPS operations or audits conducted pursuant to the EMS. These reports shall be made on an annual basis.

## G. FINAL EMS/ECP COMPLIANCE AUDIT

(1)  During the final year of probation, the CAM shall conduct a final audit of EPPS' vessels.  The purpose of the final audit is to ascertain whether EPPS has fully implemented the EMS on its vessels and whether EPPS is ready for release from probation.

(2) The final audit shall be conducted, as much as is practicable under the circumstances, in accordance with the principles set forth in ISO 9000 and ISO 14011, using ISO 14012 as supplemental guidance.

(3) The CAM will deliver an Audit Report based on the finding of the final audit to the U.S. Probation Office, designated representative of the Coast Guard, and Environmental Crimes Section, United States Department of Justice no later than one hundred and twenty (120) prior to the end of probation.

(4) The final Audit Report shall present the Audit Findings using the same audit criteria as set forth *supra,* and shall also contain the following information:

(a)  Audit scope, including the time period covered by the audit;
(b)  The date(s) the on-site portion of the audit was conducted;
(c)  Identification of the audit team members;
(d)  Identification of the company representatives and regulatory personnel observing the audit;
(e)  The distribution list for the final Audit Report:

9

(f) A summary of the audit process, including any obstacles encountered;

(g) Detailed Audit Findings, including the basis for each finding and the Area of Concern identified;

(h) Identification of any Audit Findings corrected or Areas of Concern addressed during the audit, and a description of the corrective measures and when they were implemented;

(i) Certification by the CAM that the final audit was conducted in accordance with this document and general audit principles.

## H. NON-COMPLIANCE

(1) This EMS/ECP does not in any way release EPPS from complying with any applicable international conventions and treaties, State or Federal statutes and/or regulations, the ISM Code, or other international maritime conventions or treaties and does not limit imposition of any sanctions, penalties, or any other actions, available under those international conventions and treaties, State or Federal statutes and regulations, the ISM Code, or other international maritime safety conventions or treaties.

(2) The EMS/ECP shall be part of the Plea Agreement and adherence to it will be a condition of probation. Failure to comply with any part of this EMS/ECP (including but not limited to refusal to pay valid charges for the CAM and failure to provide the CAM access to vessels or documents) shall be a violation of the Plea Agreement and shall be grounds for the revocation or modification of EPPS probation. Should the United States or the U.S. Probation Office seek to revoke or modify EPPS probation based on EPPS refusal to pay valid charges for the CAM and/or its failure to provide the CAM access to vessels or documents, and/or as a result of any disagreement regarding any of the provisions of this EMS/ECP, EPPS shall have the right to contest the reasonableness of such revocation before the appropriate U.S. District Court.



## I. CCM/VESSEL MASTER RESPONSIBILITIES

(1) The Master of any of EPPS vessels covered under this ECP, with the assistance of the CCM, shall ensure that timely reports are made to the United States Coast Guard of any non-compliant condition of any of EPPS operated and/or managed vessels that calls upon any Port or Place in the United States or sails into any waters under the jurisdiction of the United States. EPPS shall establish that enforcement of and employee compliance with the EMS/ECP, ISM Code, MARPOL, and all applicable State and Federal safety and environmental statutes and regulations is an important positive factor and that failure to comply with such policies, regulations, and laws will be a negative factor in all appropriate personnel evaluations.

## J. BOARD OF DIRECTORS

EPPS shall ensure that yearly its Board of Directors or equivalent governing structure receive and review reports from the CCM and any applicable report from the CAM concerning the implementation of this EMS/ECP, including environmental compliance, EMS implementation, and manager, officer, and crew training. Copies of those portions of the meeting agendas and internal company reports concerning these items shall be included in the reports to the United States.

## K. TRAINING REQUIREMENTS

(1) The CCM will be responsible for ensuring that sufficient training is provided to all crewmembers serving on its vessels specifically to include the environmental protection and reporting requirements required under this ECP.

(2) All new crewmembers hired to work on EPPS vessels shall receive training within seven (7) days of beginning to work on board the vessel. EPPS shall maintain documentation onboard each of its operated and/or managed vessels verifying that all officers and crewmembers working on the vessel have received the required training. Such documentation shall be made available to the CAM and the United States Coast Guard upon request.

(3) The Chief Engineer onboard each of EPPS operated and/or managed vessels listed shall prepare independent written

verification that all engineroom crew members have received the training required by this EMS/ECP. All engineroom crewmembers shall sign and date a statement acknowledging completion of the training. This written verification, together with the signed acknowledgment, shall be completed semi-annually and maintained in the engine control room of each vessel.

## L. ENGINEERING REQUIREMENTS

(1) Unless otherwise stated, all of the requirements set forth below, if not in contravention of any Classification Society, Treaty or other Flag State requirement, shall be implemented on the vessels covered under this ECP as soon as practicable, as determined by the CCM and not later than one year from the date of the signing of the plea agreement.

(2) Bilge Main Cross -Connections:

    (a) EPPS shall immediately notify all of its vessels regarding the prohibition against non-emergency use of cross connections from engine room bilge mains to the suction piping of larger pumps which may be referred to as the "fire and general service pump" or "fire, bilge and ballast" pump. The message shall state that the usage of these crossovers is similar to bypassing the OWS equipment and strictly prohibited.

    (b) The deck plates above or near the locations of these cross connections and the valves' bodies and associated hand wheels shall be painted international orange. A brightly colored sign with three inch letters shall be permanently fixed nearby reading, "Bilge System Piping Crossover-Emergency Use Only."

    (c) To prevent unauthorized usage, Chief Engineers shall place numbered seals on these valves.



    (d) The seal numbers shall be tracked in a seal number logbook and explanations shall be given any time a crossover to the bilge main is opened. Seals shall be used in other areas of the machinery space. The Master of the vessel shall retain the replacement seals in the vessel's safe. The Master will keep an additional log documenting when seals are replaced and their respective numbers. The CCM will be responsible for ensuring fleet wide that no duplication of seal numbers occur and will have a master tracking document indicating which series were supplied to each vessel.

    (e) If the valves are remotely operated from the engine control room, the control must also be disabled and notice made near the associated push buttons or switches. They shall also be sealed.

    (f) All other bilge suction valves not connected to the bilge main, including independent emergency suctions to the vessel's engine room bilges like those that may be connected to sea water circulating pumps, will be painted brightly and labeled similarly "Emergency Bilge Suction -Emergency Use Only," Their valve wheels will also have a numbered and logged seal capable of breakaway during emergency.   Seal numbers shall be kept in the Chief Engineer's official seal log book and explanations given for breakage or replacement.

(3) Blank Flanges:

    (a) To prevent unauthorized connections within the engineroom and machinery spaces of EPPS vessels, every blank flange associated with any piping leading overboard, on systems such as salt water service, main engine raw water cooling or other systems, shall be permanently secured, removed or fitted with numbered seals through the flange bolts to prevent unauthorized connections and discharges. The seals used shall be numbered and records kept in the previously mentioned log.

    (b) The blank flange securing the bilge and sludge transfer system and the shore connection discharge valve at the discharge stations shall also require a numbered seal that will be maintained. Seal numbers shall be kept in the Chief Engineer's official seal log book.

(4) Tank Sounding Log:

The CCM shall ensure the immediate usage of Tank Sounding Log Books on all vessels. Engineroom crewmembers shall be required to sound all waste, sludge, and bilge tanks associated with bilge water, oil wastes, or sludge during each watch for vessels having a manned engine room or twice daily for those having an unmanned engineroom. The Tank Sounding Log shall be initialed by the crewmember that obtained the reading. The Tank Soundings Log shall be maintained in the engine control room and made available during all inspections and audits required by this agreement.

(5) Oil-to-Sea Interfaces:

    (a) EPPS agrees to immediately develop for each vessel a log book relating to equipment having oil-to-sea interfaces. Such systems may be oil lubricated stern tubes, bow or stern thrusters, stabilizers, hydraulically operated controllable pitch propellers, and similar equipment whereby the leakage of a sealing component may cause a loss of operating medium into the surrounding waters of the vessel. Any replenishment of oil into the head tanks, operating systems reservoirs or other receivers associated with this equipment shall be logged regardless of quantity. Ingress of water into these systems must also be logged.

    (b) When known, an explanation of the loss shall be provided, along with dates and time and signature. Routine stern tube lube oil loss must be logged and reported to the CCM immediately on each occasion. EPPS agrees to remove from employment any Chief Engineer who fails to report these conditions.

(6) Record Keeping:

    All Soundings and Logs required by this section shall be maintained onboard the vessel for a period of three years from the date of the final entry.



## M. DOCUMENTATION AVAILABLE FOR INSPECTION

The CCM shall ensure that all documentation required by this EMS/ECP is maintained and available for inspection by the CAM and the United States Coast Guard. The Master of each of EPPS covered vessel under this ECP, shall maintain on board the vessel, all records required by International conventions and treaties including SOLAS, the ISM Code, and MARPOL and applicable State and Federal statutes and regulations and any additional documents required under this EMS/ECP, such as crew training records, and will make these records available to the CAM and the United States Coast Guard upon request. A summary of this information and any explanation, where appropriate, shall be included in the reports to be submitted to the United States by the CAM.

## N. CHANGES IN OWNERSHIP/MANAGEMENT

The parties recognize that during the term of probation ownership of vessels operated by EPPS that call on ports or places in the United States may change. Any vessel, the operation, management, manning or control of which is assumed by EPPS, and which calls on ports or places in the United States shall be subject to the terms and conditions of this EMS/ECP. Any vessel removed from the ownership, operation, management, manning or control by EPPS, or which stops calling in the United States, shall be excluded from the scope of the EMS/ECP. EPPS agrees that it will immediately (but in no event later than 21 days following a change) notify the United States of any change in name, flag of registry, recognized organization, ownership or class society of any such of EPPS vessels, to include any vessel the operation, management, manning or control of which is assumed by EPPS and which calls in the United States. EPPS agrees that this EMS/ECP shall remain in effect for all of the aforesaid vessels regardless of changes in the vessels' flag of registry, recognized organizations, name, or class society, so long as the vessels are owned, managed, operated or manned by EPPS. EPPS shall notify the United States before any vessel is released from the requirements of the EMS/ECP due to a change in ownership, management, manning or control, or if such vessels cease calling on ports or places in the United States.

## O. SELF-ENFORCEMENT

EPPS further agrees that it will undertake and implement the necessary procedures to ensure that this EMS/ECP is diligently complied with by the officers and crew of each of EPPS operated and/or managed vessels, as well as by all shore

side employees, managers and other employees of EPPS subsidiaries, affiliated business entities (owned wholly or partially by EPPS) and agents of EPPS engaged wholly or partially in the manning, and/or operation of aforesaid seagoing vessels or contracted to do the same, on the date of sentencing or at any time during the period of probation.

## P. REVISIONS/MODIFICATIONS

The requirements of this EMS/ECP, including the dates and time periods mentioned herein, shall be strictly complied with. Should EPPS be unable to comply with any of the deadlines, EPPS shall immediately notify the United States in writing of the reason(s) for non-compliance, and propose a revised timetable. The United States shall then determine as to whether the revised timetable should be accepted.

## Q. REPORTS

All reports, documents and correspondence required under this EMS/ECP to be sent to the United States shall be sent to the following offices:

(a) U.S. Attorney's Office
District of Puerto Rico
Attn: Marshal Morgan
Torre Chardon , Suite 1201
350 Carlos Chardon Avenue
San Juan, PR 00918

(b) U.S. Department of Justice
Environmental Crimes Section
Attn: Ken Nelson
60 I "D" Street, NW, Suite 2814
Washington, D.C. 20004

(c) U.S. Coast Guard Commandant (CG-543)
Office of Vessel Activities
Attn: Designated Representative of the Coast Guard
2100 Second Street, SW
Washington, D.C. 20593-0001

(d) U.S. Probation Department
District of Puerto Rico
Federico Degetau Federal Building
150 Carlos Chardón Street
Office 400
San Juan PR 00918-1741

Defendant has read this ECP carefully and understands it thoroughly. Defendant enters into this ECP knowingly and voluntarily, and therefore agrees to abide by its terms. By its signatures below, the corporate representative agrees that he/she is duly authorized by the corporation's Board of Directors or equivalent governing structure pursuant to the same notarized legal document filed in United States v. EPPS Shipping Company certifying that the defendant company is authorized to enter into and comply with all of the provisions of this Plea Agreement.

DATED:                          EPPS SHIPPING COMPANY
Feb 15/11
                                By:

As counsel for the Defendant, we represent that we have discussed with our corporate client and its duly authorized

representative(s) the terms of this EMS/ECP and have fully explained its requirements. We have no reason to doubt that our client is knowingly and voluntarily entering into this EMS/ECP.

DATED:

_____
ANTONIO BAUZA
Counsel for EPPS Shipping Company

On behalf of the United States, the following agree to the terms of the EMS/ECP

DATED: 2/15/11

_____
MARSHAL MORGAN
Assistant United States Attorney

DATED: 2/15/11

_____
KENNETH NELSON
Trial Attorney

14